**[Cite as *Kramer v. PAC Drilling Oil & Gas, L.L.C.*, 197 Ohio App.3d 554, 2011-Ohio-6750.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

KRAMER et al.,

     Appellants,

     v.

PAC DRILLING OIL & GAS, L.L.C., et al.,

     Appellees.

C.A. No.     11CA0003

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     09-CV-0287

APPEARANCES:

David J. Wigham and Lucas K. Palmer, for appellants.

Nathan D. Vaughan and Matthew P. Mullen, for appellees.

DECISION AND JOURNAL ENTRY

Dated: December 29, 2011

DICKINSON, Judge.

INTRODUCTION

{¶1}   John and Chris Kramer bought 14 acres of land from Joseph and Helen Kocsis to board and train horses. The land was part of a 149-acre tract that was subject to an oil and gas lease held by Phillip and Sandra Caldwell. Under the terms of the lease, the Kocsises were entitled to free gas for domestic purposes. At the time of the sale, the Kocsises and Caldwells amended the lease to allow the Kramers to use 250,000 cubic feet of gas per year without charge. While the Kocsises had always received their gas by connecting to a gathering line that ran along their property, a couple of years after the Kramers bought the 14 acres, they experienced

disruptions in the flow of gas. The Kramers, therefore, ran a new gas line directly to one of the wellheads on the 149 acres. By this time, the Caldwells had assigned the oil and gas lease to a family business called PAC Drilling Oil & Gas, L.L.C. When a dispute arose between PAC and the Kramers regarding whether the Kramers were allowed to connect directly to a wellhead, PAC attempted to terminate the Kramers' right to free gas by surrendering the lease to the extent that it covered their 14 acres. The Kramers sued PAC, the Caldwells, and the Kocsises, seeking a declaratory judgment regarding their right to free gas and a share of the royalties of the gas produced since they acquired the 14 acres. The trial court granted summary judgment to PAC and the Caldwells, concluding that PAC's surrender of the lease to the Kramers' 14 acres terminated their right to free gas. The Kramers have appealed, assigning as error that the trial court incorrectly granted summary judgment to PAC and the Caldwells. We reverse, because PAC's surrender of its lease of the Kramers' oil and gas estates did not terminate the free-gas covenant.

## BACKGROUND

{¶2} In 1978, the Kocsises leased their oil and gas rights to the 149 acres to the McClanahan Oil Company. Under the terms of the lease, McClanahan Oil agreed to pay the Kocsises one-eighth of the revenue it generated from selling gas produced on the property. It also agreed that if it did not begin drilling wells by the end of January 1979, it would pay the Kocsises four dollars per acre for each year that it delayed drilling. It further agreed that if it decided not to sell the gas produced by a well because of market conditions, it would pay the Kocsises 50 dollars per year for each such well. The lease reserved to the Kocsises the right to take an unlimited amount of gas from any producing well for domestic purposes, as long as they used their own resources to make the connection and assumed any risks. The lease further

provided that "[a]t any time, Lessee, its successors or assigns, shall have the right to surrender this lease or any part thereof for cancelation, after which all payments and liabilities hereunder thereafter shall cease and determine, and if the whole is surrendered, then this lease shall become absolutely null and void."

{¶3}    McClanahan Oil and its successors drilled two wells on the Kocsises' property, one on the north side of the property and one on the south side. Gas from the two wells, along with gas from wells drilled on some of the Kocsises' neighbors' properties, feeds into a main "gathering" line that connects to Dominion East Ohio Gas's central line.

{¶4}    At the time they entered the lease, the Kocsises lived on the 149 acres in a farmhouse that was closer to the well on the north side of their property than to the well on the south side. The farmhouse, however, was on the opposite side of the gathering line from the well. Accordingly, instead of running a gas line all the way to the wellhead, the Kocsises just connected the farmhouse to the gathering line in order to obtain their free gas.

{¶5}    In the mid-2000s, the Kocsises decided to sell the farmhouse. After unsuccessfully attempting to sell it to relatives, the Kocsises asked the Kramers whether they would be interested in buying it. The Kramers, thinking that the farmhouse and its attendant agricultural buildings would be a good place to board and train horses, negotiated a purchase agreement under which they would buy 14 of the Kocsises' 149 acres.

{¶6}    Neither of the wells on the Kocsises' property was on the 14 acres they intended to sell to the Kramers, but to facilitate the sale, the Kocsises wanted to ensure that the Kramers could receive free gas. The Caldwells, who had acquired the oil and gas rights after a series of conveyances, agreed to amend the lease to allow the Kramers to use up to 250,000 cubic feet of gas per year. According to one of the Caldwells' sons, it is unusual for a well to last more than

15 to 20 years like the wells on the Kocsises' land. Therefore, it was advantageous for their family to cap the amount of free gas that the farmhouse used, in order to prolong the commercial viability of the wells. The Kocsises and Caldwells executed an amendment to the lease, under which the free-gas paragraph was amended by adding the following: "Occupants of the [farmhouse] shall be entitled to 250,000 cubic feet per annum of free gas for domestic use plus heating of the garage and the hot water tank. Gas used in excess of 250,000 cubic feet per annum shall be billed to the occupant of said residence at well head price. In addition, an unlimited quantity of free gas shall be supplied to Joseph Kocsis, Jr. and Sherri A. Kocsis, husband and wife, at their residence * * * for domestic and garage use. These modifications supersede the original provisions which may be in conflict with this amendment and this amendment shall be integrated in paragraph six as if originally adopted."

{¶7} After operating their horse business for a couple of years without problems, the Kramers began experiencing disruptions in the supply of gas coming to the farmhouse from the gathering line. Each time there was a disruption, they would notify PAC, which would send someone out to investigate. A leak in the line was usually discovered. The Kramers eventually grew tired of the disruptions and ran a new gas line directly to the well on the north side of the Kocsises' property. According to PAC, the extra connection caused the pressure in the well to drop, causing brine to accumulate in the wellhead. This made it more difficult to produce gas from the well. When negotiations with the Kramers failed, PAC shut in the well on the north side, cutting off the Kramers' access to free gas. PAC also sent the Kramers a notice of cancellation, surrendering the oil and gas lease to the extent of their 14 acres.

{¶8} The Kramers sued PAC and the Caldwells, requesting a declaratory judgment that they are entitled to 250,000 cubic feet of free gas per year and an injunction to prevent the well

to which they had connected from being shut in. They also filed breach-of-contract, conversion, and unjust-enrichment claims, seeking to recover a share of the gas royalties. They further sought to eject PAC from operating the Kocsises' wells and quiet title regarding the oil and gas rights to their 14 acres. They later amended their complaint to assert breach-of-contract and fraudulent-misrepresentation claims against the Kocsises. PAC and the Caldwells counterclaimed, seeking a declaration that the Kramers' right to free gas has been terminated and to recover for the harm the Kramers did when they connected directly to the well. The Kocsises also counterclaimed for trespass, seeking damages for the pipeline the Kramers placed across their land.

{¶9} PAC and the Caldwells moved for summary judgment on the Kramers' claims, and the Kramers filed a cross-motion for summary judgment. The trial court granted summary judgment to PAC and the Caldwells, concluding that PAC's surrender of the oil and gas lease regarding the Kramers' 14 acres terminated the Kramers' entitlement to free gas. It concluded that in light of that decision, the Kramers' other claims were moot. The Kramers subsequently dismissed their claims against the Kocsises, and the trial court dismissed PAC's, the Caldwells', and the Kocsises' counterclaims. The Kramers have appealed the trial court's summary-judgment ruling, assigning as error that it incorrectly granted summary judgment to PAC and the Caldwells.

OIL AND GAS LEASES

{¶10} "The rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument[.]" *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129 (1897). "Such leases are contracts, and the terms of the contract with the law applicable to such terms must govern the rights and remedies of the parties." *Id.* The construction of written contracts

and instruments of conveyance is a matter of law that this court reviews de novo. *Bath Twp. v. Raymond C. Firestone Co.*, 140 Ohio App.3d 252, 256 (2000).

{¶11} Under the terms of the oil and gas lease at issue in this case, the Kocsises "grant[ed] unto [McClanahan Oil] all of the oil and gas and all of the constituents of either in and under [the 149 acres] together with the exclusive right to drill for, produce and market oil and gas and their constituents[.]" The Ohio Supreme Court has recognized that language like the language used in this lease operates as "more than a mere license." *Harris v. Ohio Oil Co.* at 129. Rather, it conveys "a vested, though limited, estate in the lands for the purposes named in the lease." *Id*. at 130. The lease separated the surface estate of the Kocsises' land from its oil and gas estates and conveyed ownership of the oil and gas estates to McClanahan Oil. See *Bath Twp. v. Raymond C. Firestone Co.* at 256 ("[I]t is possible for the total interest in real property to be divided in such a way that the surface estate is severed from the mineral estate"); see also *Moore v. Indian Camp Coal Co.*, 75 Ohio St. 493, 499 (1907) (recognizing that a lease may sever the ownership of the surface of land from the mineral rights to that land). McClanahan Oil became the fee-simple owner of the conveyed oil and gas estates while the Kocsises retained a possibility of reverter as provided in the lease. Because of the possibility of reverter, McClanahan Oil's fee-simple estate in the oil and gas was a fee-simple determinable rather than a fee-simple absolute. *Harris v. Ohio Oil Co.* at 130-131. (noting that when an oil and gas lease ends, "whether caused by the exhausting of the oil and gas, or by the permanent abandonment of production, the lease will cease, and the whole estate in the premises will become the property of the owner of the fee, not by forfeiture, but by virtue of the terms of the lease"); see *Moore v. Indian Camp Coal Co.* at 499 (recognizing that fee-simple mineral estate is determinable upon the exhaustion of the minerals); *see also Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d

188, 192 (Tex.2003) ("[A]n oil and gas lease is not a 'lease' in the traditional sense of a lease of the surface of real property. In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee. Consequently, the lessee/grantee acquires ownership of all the minerals in place that the lessor/grantor owned and purported to lease, subject to the possibility of reverter in the lessor/grantor. The lessee's/grantee's interest is 'determinable' because it may terminate and revert entirely to the lessor/grantor upon the occurrence of events that the lease specifies will cause termination of the estate").

{¶12} According to the lease, it could end for a number of reasons, including the lessee's decision to surrender it. The question in this case is whether PAC's partial surrender of the lease terminated the Kramers' right to free gas. PAC has argued that it did, pointing to language in the surrender clause providing that after surrender, "all payments and liabilities hereunder thereafter shall cease and determine[.]" The question is whether the Kramers' free-gas entitlement is a payment or liability regarding the 14 surrendered acres.

{¶13} "Under Ohio law, a free gas clause is construed as a covenant running with the surface ownership of the leasehold tract unless a contrary intention appears in the wording of the instrument." *Oxford Oil Co. v. Wills*, 5th Dist. No. 1999 AP 11 0067, 2000 WL 1901451, at *3 (Dec. 21, 2000). "The theory upon which the covenant is held to run with the surface and not the mineral, gas and oil estate is that the surface owner of the house, or other building located thereon and entitled to free gas, is presumptively the one intended to be benefited." *Stapleton v. Columbia Gas Transm. Corp.*, 2 Ohio App.3d 15, 18 (1981).

{¶14} Under the initial terms of the lease, the Kocsises reserved free gas for domestic use wherever they lived on the 149 acres. They also had the right to build additional dwellings

for their children, and those children who lived on the 149 acres were also entitled to free gas. The Kocsises could also assign their rights under the lease.

{¶15} Although the Kocsises wanted to sell some of their property to the Kramers, they wanted to ensure that their son, who lived on the 149 acres, continued receiving free gas. Under the terms of the initial lease, only the "lessor's" children had a right to free gas. The Kocsises wanted to amend the lease to clarify that their son could continue receiving free gas even if they sold some of their property. As previously mentioned, the Caldwells were also interested in amending the lease to cap the amount of free gas that could be used by the farmhouse. The terms that the Kocsises and Caldwells agreed to were that the "[o]ccupants of the [farmhouse] shall be entitled to 250,000 cubic feet per annum of free gas for domestic use plus heating of the garage and hot water tank. * * * In addition, an unlimited quantity of free gas shall be supplied to [the Kocsises' son] at [his] residence * * * for domestic and garage use." The Kocsises and Caldwells agreed that "[t]hese modifications supersede the original provisions which may be in conflict with this amendment[.]"

{¶16} Because the right to free gas benefits the occupants of the farmhouse regardless of who they are, we conclude that the free-gas clause created a covenant that runs with the surface estate of the land. *Stapleton v. Columbia Gas Transm. Corp.*, 2 Ohio App.3d at 18, 440 N.E.2d 575. The lease conveyed only the Kocsises' oil and gas estates to McClanahan Oil. Accordingly, when PAC surrendered the lease as to the 14 acres, it terminated only the "payments and liabilities" related to the oil and gas estates.

{¶17} Under the terms of the lease, there are payments and liabilities that relate exclusively to the oil and gas estates. First, if the lessee did not begin operating a well on the land by the end of January 1979, it owed four dollars per acre for every 12 months that it delayed

operations. Second, the lessee must pay the lessor a royalty of one-eighth of all the gas and casing-head gas that it sells from the oil and gas estates. Third, if the lessee stops selling gas from a well because of market conditions, it must pay the lessor $50 per year.

{¶18} PAC's surrender of its oil and gas estates for the Kramers' 14 acres did not extinguish the Kramers' right to use 250,000 cubic feet of gas without charge per year because the entitlement to free gas is a covenant running with the surface estate of the land, which is not affected by the surrender of oil and gas rights. This conclusion is consistent with the purpose of surrender clauses, which is to avoid paying rents or royalties on unproductive land. *Kennecott Corp. v. Union Oil Co.*, 196 Cal.App.3d 1179, 1187 (1987); *Superior Oil Co. v. Dabney*, 211 S.W.2d 563, 565 (Tex.1948) (noting that purpose of surrender clause was to relieve the lessee of the duty to drill on the surrendered acreage). To terminate the free-gas covenant by surrender, PAC would have to surrender the entire contract, at which time the entire "lease shall become absolutely null and void." We, therefore, conclude that the trial court incorrectly granted summary judgment to PAC. The Kramers' assignment of error is sustained.

### CONCLUSION

{¶19} PAC's partial surrender of its lease of oil and gas estates did not terminate the Kramers' right to free gas, because the free-gas clause created a covenant running with the surface estate of the land. The judgment of the Wayne County Common Pleas Court is reversed.

Judgment reversed
and cause remanded.

———

BELFANCE, P.J., concurs.

CARR, J., dissents.

CARR, Judge, dissenting.

**{¶20}** I respectfully dissent. "'When a trial court enters a judgment in a declaratory judgment action, the order must declare all of the parties' rights and obligations in order to constitute a final, appealable order.'" *No-Burn, Inc. v. Murati*, 9th Dist. No. 24577, 2009-Ohio-6951, at ¶11, quoting *Dutch Maid Logistics, Inc. v. Acuity*, 8th Dist. No. 86600, 2006-Ohio-1077, at ¶10. Because the trial court's judgment did not declare all parties' rights, there is no final, appealable order, and this court lacks jurisdiction to consider the merits of the appeal.

_____