[Cite as *Eisenbarth v. Reusser*, 2014-Ohio-3792.]

STATE OF OHIO, MONROE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

LELAND EISENBARTH, et al.,      )
)     CASE NO.   13 MO 10
     PLAINTIFFS-APPELLANTS/   )
     CROSS-APPELLEES,   )
)
VS.     )    O P I N I O N
)
DEAN REUSSER, et al.,     )
)
     DEFENDANTS-APPELLEES/   )
     CROSS-APPELLANTS.   )

CHARACTER OF PROCEEDINGS:     Civil Appeal from Common Pleas Court, Case No. 2012-292.

JUDGMENT:     Affirmed; Cross-Appeal Dismissed.

APPEARANCES:
For Plaintiffs-Appellants/     Attorney Craig Sweeney
Cross-Appellees:     Attorney Richard Yoss
     122 North Main Street
     Woodsfield, Ohio  43793

For Defendants-Appellees/     Attorney Andrew Lycans
Cross-Appellants:     Attorney Patrick Noser
     225 North Market Street
     P.O. Box 599
     Wooster, Ohio  44691

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  August 28, 2014

VUKOVICH, J.

{¶1} The Eisenbarth plaintiffs appeal the summary judgment granted by the Monroe County Common Pleas Court in favor of the Reusser defendants. The Reussers cross-appeal in the event this court agrees with the Eisenbarths' argument that the trial court erred in finding a savings event. The trial court found that the Reussers' one-half mineral interest in the minerals under the Eisenbarths' land was not abandoned under the 1989 Dormant Mineral Act and that a bonus paid under an oil and gas lease must be evenly split between the Eisenbarths and the Reussers.

{¶2} The Eisenbarths first argue that an oil and gas lease is not a title transaction and thus not a savings event or that their own act of signing the lease cannot save the Reussers' minerals from abandonment. We disagree and conclude that a recorded oil and gas lease of all of the minerals can be a statutory savings event.

{¶3} The Eisenbarths then argue that the 1974 recorded lease ceased to be a savings event in 1994, urging that the statute uses a rolling twenty-year look-back period rather than a fixed period. We uphold the trial court's application of a fixed look-back period and thus agree there was no abandonment under the 1989 DMA.

{¶4} Lastly, the Eisenbarths urge that the Reussers are not entitled to half of the bonus under the lease because the grant of the exclusive right to lease to the Eisenbarths should necessarily include the right to all bonus money. We disagree and conclude that the court properly split the bonus in half just as the mineral interest in split in half. For the following reasons, the Eisenbarths' arguments are overruled, the Reussers' cross-appeal is dismissed, and the trial court's judgment is affirmed.

## STATEMENT OF THE CASE

{¶5} In 1954, William Eisenbarth transferred two tracts of land covering approximately 153 acres in Monroe County to Paul and Ida Eisenbarth. The deed reserved for William one-half of all minerals underlying the lands and all rights to develop and remove those minerals. The right to lease the minerals, however, was expressly given to Paul and Ida. William then transferred by royalty deed his half of the mineral estate to his other child, Mildred Reusser. Paul and Ida entered various

oil and gas leases in the years thereafter, the last being signed in 1973 and recorded on January 23, 1974.

{¶6} In 1989, they transferred nearly 27 acres (tract II) to their son Keith in a deed stating that it was subject to all reservations of record. When Paul died, his interest in tract I was conveyed to Ida by a certificate of transfer filed in 1990, which included the 1954 deed's language on the mineral reservation and the right to lease. When Ida died, a 1998 certificate of transfer was filed, which transferred tract I to her three sons, Keith, Leland, and Michael (hereinafter the Eisenbarths) and included the language from the 1954 deed. The Eisenbarths executed a joint and survivorship deed for themselves, again repeating the aforementioned language.

{¶7} Mildred Reusser died in 2002, leaving her estate to the defendants herein: Dean Reusser, Marilyn Ice, Wilda Fetty, Martha Maag (who then died leaving her interest to her husband Robert Maag), Vernon Reusser, Paul Reusser, Davis Reusser, and Dennis Reusser (hereinafter collectively referred to as the Reussers).

{¶8} In 2008, the Eisenbarths signed an oil and gas lease. In 2009, they published a notice of abandonment of Mildred Reusser's one-half interest in the minerals, and the Reussers responded with a claim to preserve. In 2012, the Eisenbarths signed an oil and gas lease with another company and received a $766,250 signing bonus, half of which is being held in escrow.

{¶9} The Eisenbarths then filed the within lawsuit against the Reussers seeking in pertinent part a declaration that the 1954 deed did not reserve the right to bonus money and that the Reussers' mineral interest is deemed abandoned under the 1989 Dormant Mineral Act. The Reussers counterclaimed seeking in pertinent part quiet title to their one-half mineral interest and half of the bonus money paid under the 2012 lease. The parties filed cross motions for summary judgment.[1]

---

[1]Below, the Eisenbarths argued abandonment under both the 1989 DMA and the 2006 DMA. The Reussers initially contested the Eisenbarths' ability to proceed under the 1989 DMA but make no arguments on appeal that the 1989 DMA cannot be applied. Their final submission below suggested they no longer contested the Eisenbarths' position that any abandonment under the 1989 DMA was self-executing and that the court could use that version to determine if the mineral interest was abandoned. *See* Defendant's Apr. 29, 2013 Reply at 11 ("Defendants have never argued that the Dormant Mineral Act of 1989 was not a self-executing statute. Defendants have also never argued

{¶10} On June 6, 2013, the trial court granted judgment to the Reussers, quieting title to their one-half mineral interest underlying the two tracts and awarding them half of the bonus money. The trial court found that the Reussers' mineral interest had not been abandoned as oil and gas lease over all of the minerals recorded in 1974 was a savings event. The court stated that an oil and gas lease conveys a determinable fee interest in the minerals that is subject to reverter in the event there is no production or the lease expires, citing *Bender v. Morgan*, Columbiana C.P. No. 2012-CV-378 (Mar. 20, 2013). The court also held that a grant of the right to lease does not implicitly convey away the right to receive bonuses on the minerals retained.

{¶11} The Eisenbarths filed a timely appeal. The Reussers cross-appealed contesting the trial court's initial conclusion that various surface deeds in the Eisenbarths' chain of title were not savings events because they merely repeated the original reservation.

STATUTORY OVERVIEW

{¶12} Pursuant to former R.C. 5301.56(B)(1), a mineral interest held by a person other than the surface owner of the land subject to the interest shall be deemed abandoned and vested in the owner of the surface unless (a) the mineral interest deals with coal, (b) the mineral interest is held by the government, or (c) a savings event occurred within the preceding twenty years.

{¶13} The six savings events are as follows: (i) the mineral interest has been the subject of a title transaction that has been filed or recorded in the recorder's office; (ii) there has been actual production or withdrawal by the holder; (iii) the holder used the mineral interest for underground gas storage; (iv) a mining permit has been

---

that the Court could not consider whether the mineral interest could be deemed abandoned under the 1989 version of the Act."), after conducting a case review of *Texaco, Inc. v. Short*, 454 U.S. 516, 533-534, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982) (which case characterized the provision in Indiana's Mineral Lapse Act, that an interest shall be extinguished and ownership shall revert if unused for 20 years, as a self-executing feature that provides for automatic lapse and reversion). This court has since concluded that prior abandonments under the 1989 DMA can still be formalized even after the 2006 amendments. *Swartz v. Householder,* 7th Dist. Nos. 13JE24, 13JE25, 2014-Ohio-2359; *Walker v. Shondrick-Nau,* 7th Dist. No. 13NO402, 2014-Ohio-1499 (fka *Walker v. Noon*).

issued to the holder; (v) a claim to preserve the mineral interest has been filed; or (vi) a separately listed tax parcel number has been created. R.C. 5301.56(B)(1)(c)(i)-(vi).

{¶14} The effective date of this statute was March 22, 1989, but a grace period was provided whereby a mineral interest shall not be deemed abandoned due to a lack of (B)(1) circumstances until three years from the effective date of the statute. R.C. 5301.56(B)(2). Another section provides that a mineral interest may be preserved indefinitely from being abandoned by the occurrence of any of the savings events in (B)(1)(c), including, but not limited to, successive filings of claims to preserve mineral interests. R.C. 5301.56(D)(1).

ASSIGNMENT OF ERROR NUMBER ONE

{¶15} The first assignment of error set forth by the Eisenbarths provides:

{¶16} "The Trial Court erred in finding that an oil and gas lease is a 'title transaction' as defined by ORC §5301.47."

{¶17} As aforementioned, a mineral interest held by a person other than the surface owner is not deemed abandoned if within the preceding twenty years: "The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located." R.C. 5301.56(B)(1)(c)(i). The lease here was recorded in the county recorder's office. Notably, R.C. 5301.09 provides: "All leases, licenses, and assignments thereof, or of any interest therein, given or made concerning lands or tenements in this state, by which any right is granted to operate or to sink or drill wells thereon for natural gas and petroleum or either, or pertaining thereto, shall be filed for record and recorded in such lease record without delay, and shall not be removed until recorded."

{¶18} A title transaction is defined as: "any transaction affecting title to any interest in land, including title by will or descent, title by tax deed, or by trustee's, assignee's, guardian's, executor's, administrator's, or sheriff's deed, or decree of any court, as well as warranty deed, quit claim deed, or mortgage." R.C. 5301.47(F) (applicable to Marketable Title Act in 5301.47-5301.56). Thus, the ultimate issue is whether a one-half mineral interest was the subject of any transaction affecting title to

any interest in land when the surface owner, who also owns half of the minerals and possess the right to lease, entered into a recorded oil and gas lease over all of the minerals.

{¶19} The Eisenbarths make various arguments in support of their contention that a lease is not a title transaction. They posit that a lease is a mere contract and is not a transaction affecting title to any interest in land, urging the trial court erred in relying on *Bender*, which held that an oil and gas lease is a fee simple determinable with a possibility of reverter. They note that after a lease is entered, the mineral owner still has title and can transfer his interest in the minerals (subject to the lease). They state that the lease only affected their own leasing rights, not the Reussers' title to their half of the minerals, relying on the general principle that a person cannot convey his co-tenant's title and emphasizing that the Reussers did not sign anything affecting their interest. They also refer to a provision regarding leases in the Marketable Title Act. *See* R.C. 5301.53(A) (preserving lessor's right to reversion of possession on lease expiration and lessee's rights in lease except as per the DMA).

{¶20} The Reussers counter that said provision shows that a lease can affect title to an interest in land and was enacted to prevent termination unless in compliance with the DMA. The Reussers urge that a surface owner who owns half of the minerals and has the executive right to lease owes a fiduciary duty to the non-executive mineral owner and signs leases for the entire estate. They point to cases involving the remedy of quiet title concerning oil and gas leases and ask how one could seek quiet title if an oil and gas lease does not affect title to an interest in land. The Reussers also note that the original bill for the 1989 DMA stated that a mineral interest would be preserved if within the preceding 20 years "[t]he interest has been conveyed, leased, transferred, or mortgaged by an instrument filed or recorded in the recorder's office of the county in which the lands are located." They state that instead of limiting coverage to these four specific verbs, the legislature adopted the broader phrase "subject of a title transaction," as title transaction was already defined as "affecting title to an interest in land" followed by a non-exclusive list of examples.

**{¶21}** As there is no Ohio appellate case law on the topic, a federal district court has asked the Ohio Supreme Court to review the issue of whether an oil and gas lease is a title transaction and the Supreme Court has accepted the certified question for review and briefing was completed in June of 2014. *Chesapeake Exploration, L.L.C. v. Buell*, Sup. Ct. No. 2014-0067 (from S.D. Ohio No. 2:12-CV-00916). We considered staying our case pending a potential decision in that case but have decided to proceed on the issue.

**{¶22}** There have been trial courts that have ruled on the issue. In the case relied upon the trial court here, the surface owner argued that oil and gas leases were not title transactions under R.C. 5301.47(F), but the trial court disagreed. *Bender v. Morgan,* Columbiana C.P. No. 2012-CV-378 (Mar. 20, 2013). The *Bender* Court pointed out that a title transaction must merely "affect" a land interest and found that an oil and gas lease clearly affects the interest in the minerals. The *Bender* court also found that an oil and gas lease created a vested estate in the lands and conveyed a fee simple determinable to the oil and gas, subject to reverter if there is no production or the lease otherwise expires. *Id.*, citing *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 48 N.E. 502 (1897) and *Kramer v. PAC Drilling & Oil*, 197 Ohio App.3d 554, 2011-Ohio-6750, 968 N.E.2d 64, ¶ 11 (9th Dist.) (a free gas case).

**{¶23}** In *Harris*, the Supreme Court stated that an oil and gas lease was more than a mere license as it created a vested, though limited, estate in the lands for the purposes named in the lease. *Harris*, 57 Ohio St. at 129-130. The Ninth District's *Kramer* case relied upon the *Harris* holding and a Texas case stating that an oil and gas lease is not a "lease" in the traditional sense of a surface lease because in a typical oil or gas lease, the lessor grants a fee simple determinable interest to the lessee, who is granted ownership in all minerals in place that the lessor purported to lease, subject to the possibility of reverter upon the occurrence of events that the lease specifies will cause termination of the estate. *See Kramer,* 197 Ohio App.3d 554 at ¶ 11, citing *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192, 47 Tex. Sup. Ct. J. 153 (2003). The Ninth District also cited *Moore*, where the Supreme Court stated: "the creation of a separate interest in the mineral with the right to

remove the same, whether by deed, grant, lease, reservation, or exception, unless expressly restricted, confers upon the owner of the mineral a fee-simple estate, which is, of course, determinable upon the exhaustion of the mine." *Moore v. Indian Camp Coal Co.*, 75 Ohio St. 493, 499, 80 N.E. 6 (1907) (permitting severance of the ownership of the surface from the ownership of the different strata of mineral underlying the surface). *See also Tisdale v. Walla*, 11th Dist. No. 94-A-0008 (Dec. 23, 1994) (lease was determinable fee interest, noting the habendum term was for a number of years and then "as long thereafter as * * *").

**{¶24}** We recognize that after *Harris*, the Ohio Supreme Court characterized oil and gas as migratory and found that a document conveying those minerals and the right to obtain them represented something other than the grant of real property. *Back v. Ohio Fuel Gas Co.*, 160 Ohio St. 81, 86, 113 N.E.2d 865 (1953). Yet, that document was said to be a license. *Id.* at 89. And, the syllabus did not contain this statement as that case dealt with merely whether the document provided constructive notice to a purchaser where it was recorded in the lease records instead of the deed records.

**{¶25}** Regardless, this case does not deal with the Dormant Mineral Act, which provides a specific statutory test. That is, if an oil and gas lease is considered a determinable fee, it may be easier to categorize as a savings event; however, the statutory question under the 1989 DMA is not whether a fee was transferred. *See McLaughlin v. CNX Gas Co.*, S.D. Ohio No. 5:13CV1502 (Dec. 13, 2013) (finding that *Back* does not answer the question here and concluding that an oil and gas lease is a title transaction). *Compare* R.C. 5301.56(A)(3) (2006 DMA language adding that a mineral interest "means a fee interest" but then also stating "regardless of how the interest is created and of the form of the interest"). The question here is whether the mineral interest has been the subject of any transaction affecting title to any interest in land that has been filed or recorded with the county recorder. *See* R.C. 5301.47(F) combined with R.C. 5301.56(B)(1)(c)(i).

**{¶26}** The Eisenbarths make statements about how they are unable to convey the Reussers' actual title to the mineral right, citing to a Fourth District case which

stated the general principle that a surface owner cannot defeat title of the mineral rights by signing an oil and gas lease. *See Morgenstern v. National City Bank*, 4th Dist. No. 85CA23 (Jan. 27, 1987). Here, however, the surface owner owned half of the mineral estate and had the right to sign oil and gas leases covering all the mineral rights, and we are not dealing with an attempt to defeat title or to convey more rights than the Eisenbarths were permitted to transfer.

**{¶27}** In *Dodd*, this court concluded that merely repeating a prior mineral reservation in a surface deed is not a savings event because that reserved mineral interest was not the "subject of" that title transaction. *Dodd v. Croskey*, 7th Dist. No. 12HA6, 2103-Ohio-4257. We applied the common definition of the word "subject" as a topic of interest, primary theme, or basis for action and concluded that the minerals were not a primary purpose of the surface transfer. *Id.* at ¶ 48. We also mentioned, *in the context of a surface deed*, that the grantor would have to be conveying or retaining the mineral interest for that interest to be the "subject of" that particular title transaction. *Id.* That case involved a deed and thus a title transaction clearly existed. The question there revolved solely around whether the mineral interest was the subject of that deed.

**{¶28}** In the present case, the subject of the oil and gas lease was the mineral interest under the surface of the Eisenbarths' property, an undivided half of which was owned by the Reusser branch of the family. The question here revolves around whether the oil and gas lease fits within the definition of a title transaction.

**{¶29}** The statute says the mineral interest must be the subject of a transaction affecting title to any interest in land without limiting the title transaction to the total conveyance of a title. R.C. 5301.47(F). Notably, a mortgage does not transfer away title. *See Levin v. Carney*, 161 Ohio St. 513, 520, 120 N.E.2d 92 (1954) (the legal and equitable title to the real estate remains in the mortgagor so long as conditions remain unbroken). *See also Blakely v. Capitan*, 34 Ohio App.3d 46, 48, 516 N.E.2d 248 (11th Dist.1986) (a 1968 court order validating a 1941 residential-only use restrictions falls under the definition of a title transaction in R.C. 3501.47(F) thus concluding that the court decree affected the title to an interest in

land even though title did not transfer). Still, a mortgage is specifically enumerated in the statute's non-exhaustive list of examples of title transactions, i.e. a mortgage is an example of a transaction affecting title to any interest in land.

**{¶30}** A recorded oil and gas lease is a transaction that similarly affects title to an interest in land. It remains with the realty if title is transferred during its terms; it would not only follow the surface estate but would also follow the mineral estate upon any transfer. The Supreme Court has stated that an oil lease is an encumbrance and thus its removal would be required under an offer to provide title "free and clear of liens and encumbrances." *Karas v. Brogan*, 55 Ohio St.2d 128, 378 N.E.2d 470 (1978). As such a lease is considered an encumbrance on a title, we conclude that it falls into the definition of "any transaction affecting title to any interest in land."

**{¶31}** The fact that the Eisenbarths signed and recorded the lease and thus essentially performed the savings event for the Reussers does not prevent the transaction from being considered as a potential savings event. The Eisenbarths had the executive right to sign leases over the entire mineral estate. Thus, when they signed, it affected the entire estate and its minerals. There is no requirement of a voluntary act; a court decree may not be "voluntary," but a court decree is specifically listed as an example of a title transaction. *See Blakely*, 34 Ohio App.3d at 48. (And, since the right to lease was voluntarily granted at the original reservation, the subsequent leases could be considered voluntary transactions affecting the minerals in any event.)

**{¶32}** In sum, the Eisenbarths were provided the right to lease by the original reservation so that a lease they sign affects both their mineral interest and the Reussers' mineral interest. All of the minerals could be extracted, and the entire mineral estate (not just the Eisenbarths' half) was subject to a lease transaction that was recorded. The mineral interest was a subject of a transaction that affected an interest in land. For all of the foregoing reasons, we conclude that a recorded oil and gas lease over the minerals sought to be abandoned can be a savings event. *Accord McLaughlin v. CNX Gas Co.*, S.D. Ohio No. 5:13CV1502 (Dec. 13, 2013). We overrule this assignment of error and uphold the trial court's decision that the oil and

gas lease recorded in 1974 can qualify as a savings event (if it falls within the relevant look-back period, which leads to the next assignment of error).

ASSIGNMENT OF ERROR NUMBER TWO

{¶33} The Eisenbarths' second assignment of error provides:

{¶34} "The Trial Court erred in holding that the severed oil and gas interest was not abandoned under the previous version of ORC §5301.56 (effective from March 22, 1989 through June 30, 2006)."

{¶35} The version of the Dormant Mineral Act being utilized herein was enacted on March 22, 1989. It provides that a mineral interest held by anyone other than the surface owner shall be deemed abandoned and vested in the surface owner unless certain listed circumstances exist, one of which is: "[w]ithin the preceding twenty years * * * the mineral interest has been the subject of a title transaction" that has been filed in the county recorder's office. R.C. 5301.56(B)(1)(c)(i). Division (B)(2) goes on to state that a mineral interest shall not be deemed abandoned under (B)(1) due to the lack of applicable circumstances until three years from the effective date of this section. R.C. 5301.56(B)(2).

{¶36} The trial court used a fixed look-back period to ascertain the existence of a savings event, looking back twenty years from the date of enactment (with acknowledgement that the mineral holders would also have the three-year grace period during which a savings event could also occur). The court found that the 1973 oil and gas lease was recorded in 1974 and thus fell within the pertinent twenty-year period.

{¶37} The Eisenbarths argue that the 1989 version of DMA was in effect from March 22, 1989 until June 30, 2006 (when the new version changed future look-back periods to twenty years immediately preceding the date on which the newly-created notice of abandonment is served or published). The Eisenbarths urge that there is a rolling twenty-year look-back period under the 1989 statute, meaning that the surface owner can pick any date that exists between March 22, 1989 and June 30, 2006 and then look back 20 years from that date (with the grace period applying in the three years after enactment). They then state that the January 1974 recordation of the oil

and gas lease would have expired as a savings event in January of 1994, resulting in automatic abandonment at that time.

**{¶38}** The Reussers initially contend that the Eisenbarths waived or invited any error because they gave multiple options below as to the look-back period. However, one can place multiple arguments before a trial court as to the proper period and alternatively argue why they would win under any period. And, the Eisenbarths' did not argue for a fixed look-back period but stated that there were no savings events in the first twenty-year period (looking back from the 1989 effective date) or in what they considered to be the last twenty-year period (looking back from June 30, 2006) and thus none within any applicable period.

**{¶39}** The Reussers substantive counterargument is that under the language of the statute, it is unreasonable to allow the surface owner to choose any random date from which to look back. They note that the legislature stated merely, "preceding twenty years," not "any twenty-year period." They suggest that (B)(1)'s bare statement "[w]ithin the preceding twenty years" read with (B)(2)'s provision of no abandonment under (B)(1) until three years from the effective date of this section shows that the "preceding twenty years" language establishes only one look-back period, looking back only from the effective date of the section.

**{¶40}** The Eisenbarths reply that the legislature did not state "twenty years from the date of the enactment." The Eisenbarths point to division (D)(1), which states: "A mineral interest may be preserved indefinitely from being deemed abandoned under division (B)(1) by the occurrence of any of the circumstances described in division (B)(1)(c) of this section, including but not limited to, successive filings of claims to preserve mineral interests under division (C) of this section." R.C. 5301.56(D)(1). They urge that the statute's allowance of successive claims to preserve shows that it covers more than one fixed twenty-year period.

**{¶41}** The Fifth District has applied the twenty-year period preceding the date of enactment. *Riddel v. Layman*, 5th Dist. No. 94CA114 (July 10, 1995). In that case, a 1965 deed reserving 49% of the mineral interest was recorded in 1973. In 1994, a subsequent surface owner sought to have that mineral interest deemed

abandoned. The Fifth District stated that the original reservation was a title transaction and it was recorded so it was a savings event as of 1973. The court concluded: "Finally, the title transaction must have occurred within the preceding twenty years from the enactment of the statute, which occurred on March 22, 1989. Appellee Layman recorded the deed on June 12, 1973, well within the preceding twenty years from the date the statute was enacted." *Id.*

{¶42} The Reussers ask that we adopt this holding as a statement that there is only one look-back and that is from the effective date (although, the three year grace period would also have to be implemented). The Eisenbarths point out that the 49% mineral rights owner filed a claim to preserve. From the facts of the *Riddel* decision, it can only be determined that this occurred in or after 1990; the Eisenbarths look outside of the decision and state that the claim to preserve was filed on May 28, 1992. The Eisenbarths thus conclude that the *Riddel* court was not concerned with looking forward due to a claim to preserve being filed within twenty years of the June 1973 recordation of the deed and the only concern was whether the recordation in 1973 or the signing in 1965 was the pertinent consideration.

{¶43} The parties also discuss how a trial court looked back from March 22, 1992 (the date of enactment plus the three year grace period) and found abandonment as of that date. *Wendt v. Dickerson*, Tuscarawas C.P. No. 2012-CV-02-133 (Feb. 21, 2013). The Eisenbarths reiterate their position that where abandonment already occurred in the earliest period, there is no need for the court to look at later periods.

{¶44} The Columbiana County Common Pleas Court in *Bender* looked back twenty years from enactment of the 1989 DMA and found a 1988 lease constituted a savings event and then looked forward twenty years *from the 1988 lease* and found that a prospective twenty year period was interrupted by the 2006 amendments, which now require notice. That case was then settled and dismissed.

{¶45} If the legislature intended that a saving events occurring in the original look-back period would last only twenty years (i.e. a rolling look-back), they did not clearly state this. The statute does not specify that a savings event must occur every

twenty years from the last savings event. Notably, Indiana's statute discusses abandonment of a mineral interest "if unused for a period of twenty years" (and "use" is defined with the various savings events). Ohio's OVI statutory look-back period states, "within twenty years of the offense." Ohio's 2006 DMA states within twenty years immediately preceding the date on which notice is served or published.

{¶46} Ohio's 1989 DMA, however, merely states that the interest is deemed abandoned if none of the savings events occurred within the preceding twenty years. The question is: within the preceding twenty years of what? The Eisenbarths' position means that the answer to this question is: the preceding twenty years of every single day after the statute's enactment (until the new statute was enacted).

{¶47} In considering this question, we ask: would a mineral rights owner be unreasonable in reading the statute on March 22, 1989, the day of enactment and saying, "I have a savings event in the past twenty years as I just bought these mineral rights in 1974; so, I'm safe," without realizing that they had to reassert their interest by 1994 (5 years after enactment and 2 years after the grace period)?

{¶48} We credit such thoughts as reasonable, and we conclude that the statute is ambiguous as to whether the look-back period is anything but fixed. The use of the words "preceding twenty years," without stating the preceding twenty years of what, does not create a rolling look-back period. Rather, the imposition of successive look-back periods would have required language that the mineral interest is deemed abandoned and vested if no savings events occurred *within twenty years after the last savings event*.

{¶49} The mention of successive claims to preserve and indefinite preservation in R.C. 5301.56(D)(1) could merely be a reference to any preservations that were filed under the OMTA as existed prior to the 1989 DMA in order to show that a new claim to preserve can still be filed if the old one was filed outside of the new twenty-year look-back. There is other statutory language connecting the twenty-year look-back period to the date of enactment as (B)(2)'s grace period provides three years *from the date of enactment* before items will be deemed abandoned. R.C. 5301.56(B)(2). As forfeitures are abhorred in the law, we refuse to extend the

look-back period from fixed to rolling. *See generally State ex rel. Falke v. Montgomery Cty. Resid. Dev., Inc.*, 40 Ohio St.3d 71, 73, 531 N.E.2d 688 (1988) (the law abhors a forfeiture).

**{¶50}** As to the Eisenbarths' query of why the legislature would enact a "dead letter law," the point of the 1989 DMA may have been to give three years to eliminate or refresh stale mineral claims in the original look-back period, and the legislature planned to enact a new version for the next twenty-year period if public policy reasons for abandonment still applied in the future. And, the legislature did then enact the 2006 DMA within twenty years of the former DMA, adding a new look-back, twenty years from the service of notice. (Or, the intent was a multiple future periods, but that intent was not properly expressed.)

**{¶51}** This assignment of error is overruled as the trial court properly applied a fixed look-back period. Because the oil and gas lease here was a savings event, the Reussers' conditional argument, that transfers between surface owners should count as title transactions, need not be addressed. *See* Appellee's Brief at 28. *See also Pang v. Minch*, 53 Ohio St.3d 186, 199-200, 559 N.E.2d 1313 (1990). In accordance, the Reussers' cross-appeal, which attempts to distinguish *Dodd v. Croskey*, 7th Dist. No. 12HA6, 2013-Ohio-4257, is dismissed.

<u>ASSIGNMENT OF ERROR NUMBER THREE</u>

**{¶52}** The final assignment of error set forth by the Eisenbarths contends that, even if there was no abandonment:

**{¶53}** "The Trial Court erred in finding that Defendants-Appellees are entitled to a portion of the bonus monies received as a result of the exercise of the oil and gas leasing rights."

**{¶54}** Briefly, the Eisenbarths claim that the terms of their new lease itself do not provide for the Reussers and that the Eisenbarths are the only intended beneficiaries. The Reussers counter that the Eisenbarths did not make this argument below. Moreover, as the Reussers respond, one cannot terminate another's rights by signing a lease with someone else. It was also admitted at oral argument that if there was production, the Reussers would be entitled to share in the royalties.

**{¶55}** The Eisenbarths' main claim here is that as the owners of the exclusive right to lease the minerals, they are entitled to the bonus earned by their exercising their right to sign leases. They urge that the reservation must be construed in favor of the grantee and against the grantor, citing *Pure Oil Co. v. Kindall*, 116 Ohio St.3d 188, 156 N.E. 119 (1927).

**{¶56}** However, that general principal applies only when the deed is ambiguous. *See id.* at 202-203. In *Pure Oil*, a deed reserved to the grantors and their heirs and assigns forever a percentage of "all royalty in the oil, gas and gasoline, produced * * *". The Court concluded that this reserved a royalty interest only, not any interest in the actual underground minerals. *Id.* at 200 (reservation of royalties and rentals is not equivalent of reserving corpus of minerals). The Court noted that the reservation did not use common language to reserve the mineral estate, such as, "reserving and excepting all the oil and gas lying under and within the premises hereby conveyed." *Id.* at 202. The latter language is more akin to the language used herein.

**{¶57}** The Eisenbarths also cite a Seventh District case and equate the Reussers' situation to a non-participating royalty interest with no right to bonuses. *See Buegel v. Amos*, 7th Dist. No. 577 (June 5, 1984). However, *Buegel* is distinguishable. In that case, the grantor reserved half "of all Royalty oil and gas * * *." *Id.* The court stated that a non-participating royalty interest includes features such as: no charge for share of discovery and production, no right to act to discover or produce, no right to grant a lease, and no right to bonuses and delay payments. *Id.* (also stating that a royalty is the return on the oil or gas removed from the premises). Just prior to stating this, the court explained that it was speaking of an interest that was designated "royalty" and was not an interest in the minerals in situ. *Id.*, citing Annotation, 4 A.L.R. 2d 505.

**{¶58}** Here, the original reservation provided that the grantor reserved "one half of all oil and gas and all other minerals underling said lands together with all rights to develop any or all of said one-half oil, gas and other minerals and to remove the same from the premises. The right to lease however is given to [the grantees]."

Thus, the grantor's reservation was not labeled as merely half of the royalty in the oil and gas as was the grantor's reservation in *Buegel*. Also different than *Buegel* is the language providing the grantor the additional right to develop and remove half of the minerals. Thus, the discussion in *Buegel* does not favor the Eisenbarths' position.

**{¶59}** We conclude that the reservation was more than the reservation of a non-participating royalty interest. There was no mention of a "royalty" or a right to a share in oil and gas "produced." The deed reserved half of "all" minerals "underlying the land." It reserved a large fractional share, which is sometimes a consideration. It reserved the right to develop and remove half, which involves ingress and egress rights. The remaining question is whether a grantor's reservation of a one-half mineral interest and a grantee's obtaining the other half plus the right to lease allows bonuses to be collected by the grantee alone, i.e. must a half mineral reservation that provides the grantee with the right to lease specifically reserve the right to one-half bonuses in order for the grantor to retain that right.

**{¶60}** The Reussers point to a common premise that the right to lease is merely "one stick the bundle" of the five attributes of a severed mineral estate: right to develop (with ingress and egress), right to receive bonus payments, right to receive delay rentals, right to receive royalty payments, and right to lease (known as the executive right). *See, e.g., Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 54 Tex. Sup. Ct. J. 1705 (2011), fn.1. The Reussers continue that the conveyance of one stick does not imply the conveyance of all sticks, urging that the reservation must indicate the surrender of the right to participate in signing bonuses.

**{¶61}** It has been stated that the various incidents of ownership of a mineral interest can be separately transferred. *See Sharp v. Gayler*, 737 P.2d 120, ¶5-6 (Ok.App.1987), citing various treatises (and concluding that a half mineral interest owner who conveyed to other the right to explore and lease retained right to signing bonus). And, in general, it does not appear disputed that the characteristics of owning a half of a mineral estate in situ remain with the grantor (for his one half) unless otherwise stated. *See id. See also Day & Co., Inc. v. Texland Petroleum, Inc.*, 786 S.W.2d 667 (Tex.1990), fn.1 (when a mineral interest is reserved or

excepted in a deed, the executive right covering that interest is also retained unless specifically conveyed); *Houston v. Moore Investment Co.,* 559 S.W.2d 850, 852 (Tex.Civ.App.1977) (reservation of half of minerals retains incidents ownership except those specifically granted).

**{¶62}** Here, the deed did state otherwise; it conveyed away the right to lease. This executive right is merely "one stick in the bundle" of conveyable rights. We agree that the other rights existing in the mineral estate that were not specifically granted were retained (as to the grantor's one-half). *See Sharp,* 737 P.2d 120 at ¶5-6 (half mineral interest owner who conveyed to other the right to explore and lease retained right to signing bonus); *Houston,* 559 S.W.2d at 852 (the reservation of half of the minerals will retain the incidents of ownership except those specifically granted); *Burns v. Audas,* 312 S.W.2d 417 (Tex.Civ.App.1958) (reservation of part of mineral estate and conveying the surface and the right to lease did not deprive grantor of share of bonus but merely transferred the executive right).

**{¶63}** We conclude that merely because a co-owner of minerals in place was given the executive right does not automatically leave the non-executive grantor with no right to receive bonus payments. *See* Charles J. Meyers & Pamela A. Ray, Perpetual Royalty and Other Non-Executive Interests in Minerals, 29 Rocky Mountain Min. L. Inst. 651 (1983) (defining a non-executive mineral interest owner as one entitled to participate in lease benefits, with no right to execute leases and stating that a mineral interest stripped of the executive right retains the full benefits of an oil and gas lease, subject to the proportion of mineral interest owned). Accordingly, the right to share in any bonus was retained with the grantor's half of the minerals.

**{¶64}** For the foregoing reasons, the Eisenbarths' three assignments of error are overruled. The trial court's judgment finding the Reussers did not abandon their mineral interest and that they are entitled to half of the bonus money is affirmed. The cross-appeal is dismissed.

Donofrio, J., concurs.
DeGenaro, P.J., concurs in judgment only with concurring in judgment only opinion.

DeGenaro, P.J., concurring in judgment only with concurring in judgment only opinion.

**{¶65}** I agree with the majority's analysis that a recorded oil and gas lease is a mineral interest that constitutes a transaction affecting title to an interest in land. I also agree that because the Eisenbarths held the executive right to execute a lease for the mineral rights, any lease the Eisenbarths executed constitutes a savings event not only for them but for the Reussers as well. Finally, I agree that the Reussers are entitled to share in the bonus. But I disagree with the majority that the 1989 version of Ohio's Dormant Mineral Act (ODMA), R.C. 5301.56, controls resolution of this case. Instead, the 2006 version applies, and as the Reussers timely filed a preservation of claim pursuant to R.C. 5301.56(H), they continue to hold the severed mineral rights. As this is the same resolution reached by the majority, I respectfully concur in judgment only.

**{¶66}** Moreover, I disagree with the manner in which the majority has interpreted the 1989 ODMA. Because R.C. 5302.56(D)(1) refers to successive filings, the 1989 ODMA contemplated that the holder of severed mineral rights was required to renew that interest of record every 20 years. Thus, the Reussers were required to make some kind of successive filing before the initial 20 year period expired. Because they failed to do so, by operation of the 1989 ODMA, the severed mineral rights reverted back to the Eisenbarths on January 24, 1994. Applying the majority's rationale that the 1989 ODMA is an automatic self-executing statute, the 2008 oil and gas lease cannot constitute a savings event for the Reussers because they were no longer holders of mineral rights that could be preserved as of that date. Although first and foremost I disagree with the majority's decision that the 1989 statute governs here, secondarily I believe their 1989 ODMA analysis is itself flawed.

**{¶67}** The ambiguity of the 1989 version of the ODMA is readily apparent. Courts are guided by canons of statutory construction when asked to construe ambiguous statutory language in order to decipher legislative intent. But given the unique procedural circumstances this case presents, namely, construing an

ambiguous statute *after* it has been amended to remove the ambiguity, we need not resort to those canons in order to glean that intent. By virtue of the 2006 ODMA, we have the rare benefit of the General Assembly's statement of its intent with respect to the ambiguous language of the 1989 ODMA. That alone dictates that the 1989 version is no longer controlling; to decide otherwise makes the enactment of the 2006 ODMA meaningless.

{¶68} This is the third in a series of cases addressing this district's resolution of the following legal question: Which version of R.C. 5301.56—that enacted in 1989 or 2006—controls abandonment of severed mineral rights where: a) the mineral rights were severed and the surface owner's fee interest was acquired before or during the time frame when the 1989 ODMA was in effect; and b) the surface owner did not claim the mineral rights were abandoned until after the effective date of the 2006 ODMA? Following two recent unanimous decisions by the same three judge panel in *Walker v. Shondrick–Nau,* 7th Dist. No. 13 NO 402, 2014-Ohio-1499 (Apr. 3, 2014) (fka *Walker v. Noon*); and *Swartz v. Householder,* 7th Dist. Nos. 13 JE 24, 13 JE 25, 2014-Ohio-2359, --- N.E.3d --- (June 2, 2014), the majority of the present panel reaffirms that in these circumstances the 1989 ODMA controls.

{¶69} As this is my first opportunity to consider an issue of first impression in this district and in Ohio, I find more persuasive and consistent with Ohio law the trial court's analysis in *Dahlgren v. Brown Farm Props., LLC.,* Carroll C.P. No. 2013 CVH 274455, holding that the 2006 ODMA controls in these circumstances, which was rejected by *Walker* and *Swartz*. Viewed from the perspective that the 2006 ODMA is in effect, coupled with the General Assembly's expressed reasons for making those amendments, and that statutes in derogation of common law must be strictly construed to preserve individual property rights, the phrase 'deemed abandoned and vested' in R.C. 5301.56(B)(1), should be construed as defining an inchoate right.

{¶70} The 2006 version of R.C. 5301.56 does what the General Assembly intended the 1989 ODMA to do but failed to achieve: balance the complementary policy goals of creating a reliable record chain of title via the Ohio Marketable Title Act (OMTA) statutory scheme—which includes the ODMA—and facilitate economic

use of mineral rights. The Ohio General Assembly recognized that the 1989 ODMA had technical problems and was thus seldom used. Specifically, the 1989 ODMA failed to define how to calculate the 20 year look-back period before *allowable* vesting can occur—to use the General Assembly's verbiage—and define the process to reunite the interests in the surface owner. The 2006 ODMA corrected inoperable, not merely ambiguous, statutory language. The current version of R.C. 5301.56 not only clarifies the process, it specifies the look-back period trigger and mandates notice to the holder before the mineral rights are deemed abandoned; only then can *allowable* vesting occur with the surface owner.

{¶71} Given the Ohio General Assembly's expressed purpose of the 2006 ODMA and the clear, unambiguous language of its modifications, the majority incorrectly validated the trial court's resolution of the parties' interests to the severed mineral rights pursuant to the 1989 ODMA. Thus, I concur in the ultimate conclusion that the Reussers did not abandon their mineral rights and would affirm the trial court, but do so pursuant to the 2006 ODMA.

{¶72} Moreover, the majority's substantive 1989 ODMA analysis is flawed. Pursuant to the 1989 ODMA, the January 23, 1974 lease constitutes a savings event which preserved the Reussers' mineral rights for the statutory 20 year period, here until January 23, 1994. However, R.C. 5301.56(D)(1) provides the holder of severed mineral rights can preserve their mineral rights for another 20 year period by filing successive claims. During the initial statutory 20 year period, the Reussers failed to file a successive claim to preserve their mineral rights. Applying the majority's rationale that the 1989 ODMA is self-executing and was still in effect, the Reussers' mineral rights were automatically abandoned and vested in the Eisenbarths as of January 24, 1994. Thus, the 2008 oil and gas lease could not constitute a savings event for the Reussers because they were no longer holders of mineral rights that could be preserved as of that date.

{¶73} Before turning to my analysis on the merits, several preliminary issues for contextual purposes need to be addressed: first, the extent of appellate de novo review where the trial court comes to the correct result but through erroneous

analysis; second, the nature of the severed mineral interest and how that is affected by principles of vesting and forfeiture; and finally, the persuasive or precedential value of law outside of Ohio when construing R.C. 5301.56.

**De Novo Review of Correct Judgment with Erroneous Reasoning**

**{¶74}** Because the procedural posture of this case is an appeal of a summary judgment, which in turn is dependent upon determining which version of R.C. 5301.56 to apply, these present questions of law which are reviewed de novo. *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, ¶20.

**{¶75}** Under de novo review, an appellate court is not bound by a trial court's rationale, but will nonetheless affirm where the judgment is still correct when the appellate court applies the controlling law and proper analysis. In *State v. Garrett,* 7th Dist. No. 06 BE 67, 2007-Ohio-7212, the trial court dismissed a post-conviction petition on the merits. This court affirmed but on other grounds, sua sponte reasoning the correct basis for dismissal was the trial court lacked jurisdiction to consider the merits because the petition was untimely, and declining to address the merit arguments raised by the parties on appeal. *Id.* at ¶15, citing *State v. Peagler*, 76 Ohio St.3d 496, 501, 668 N.E.2d 489 (1996) (appellate court may resolve issue on different grounds than used by the trial court so long as the issue was raised in the trial court); *Agricultural Ins. Co. v. Constantine*, 144 Ohio St. 275, 284, 58 N.E.2d 658 (1944) (erroneous reasoning by the trial court does not warrant reversal of an otherwise correct judgment). Stated another way, an appellate court will affirm on other grounds a legally correct judgment, reasoning that no prejudice results from the trial court reaching the right result albeit for the wrong reason. *Reynolds v. Budzik*, 134 Ohio App.3d 844, 732 N.E.2d 485, fn. 3 (6th Dist.1999) fn. 3, citing *Newcomb v. Dredge*, 105 Ohio App. 417, 424, 152 N.E.2d 801 (2d Dist.1957); *State v. Payton*, 124 Ohio App.3d 552, 557, 706 N.E.2d 842 (1997).

**{¶76}** Moreover, "an appellate court is bound to affirm a trial court's judgment that is legally correct on other grounds regardless of the arguments raised or not raised by the parties." *State v. Helms*, 7th Dist. No. 08 MA 199, 2013-Ohio-5530,

¶10 (Vukovich, J. concurring), citing *State v. Ingram,* 9th Dist. No. 25843, 2012-Ohio-333, ¶7.

**{¶77}** The majority notes at footnote 1 that that the Eisenbarths sought abandonment under both versions of R.C. 5301.56 and that the Reussers contested the applicability of the 1989 ODMA, placing the question of which version of R.C. 5301.56 controls squarely before the trial court. The majority goes on to suggest that it appears the Reussers no longer take that position. Regardless, the issue can be considered on appeal, consistent with the decisions above. We are not bound by the trial court's or the parties' rationales when conducting de novo review of questions of law, including determining which version of a statute is controlling.

### Nature of Interest, Forfeiture, Vesting and Laches

**{¶78}** Central to this appeal is resolution of this question of law: how and when a severed mineral right becomes a vested right, and the process to be followed to reunite that vested right with the surface fee interest. A fee simple interest—which includes severed mineral rights—under common law "cannot be extinguished or abandoned by nonuse, and it is not necessary to rerecord or to maintain current property records in order to preserve an ownership interest in minerals."[2] An individual's vested right—created by common law or statute—has been generally defined by the Ohio Supreme Court as being in essence a property right, which is to be recognized and protected by the state from arbitrary deprivation; a vested right is more than a mere expectation or interest in the continuity of current common or statutory law; because it completely and definitely belongs to the individual it cannot be impaired or divested absent the individual's consent. *State ex rel. Jordan v. Indus. Comm.,* 120 Ohio St.3d 412, 2008-Ohio-6137, 900 N.E.2d 150, ¶9; *Walker* at ¶40. The legal weight a vested right carries is reinforced by the axiom ingrained in Ohio common law that forfeiture is not favored in law or in equity. *State ex rel. Lukens v. Industrial Commission*, 143 Ohio St. 609, 611, 56 N.E.2d 216 (1944).

---

[2]*Dahlgren*, Carroll C.P. No. 2013 CVH 274455, at \*8, quoting the Prefatory Note of the Uniform Dormant Interests Act, approved by the National Conference of Commissioners on Uniform State Laws in 1986, approved by the A.B.A. on February 16, 1987.

**{¶79}** Prior to the enactment of the 1989 ODMA, severed mineral rights were governed by Ohio case law. Thus, it is necessary to refine the question of law before us further. Specifically, we must determine which body of law controls determination of vesting, the preexisting common law or a choice between statutory options, i.e., the 1989 or 2006 ODMA, particularly where the surface owner acquired their fee interest and/or the litigation was commenced after the effective date of the 2006 statute.[3]

**{¶80}** "Ordinarily, it is the rule that statutes in derogation of the common law are to be strictly construed." *Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 414, 513 N.E.2d 776, 792 (1987). "[S]tatutes imposing restrictions upon the use of private property, in derogation of private property rights, must be strictly construed. Whenever possible, such statutes must be construed so as to avoid a forfeiture of property. No forfeiture may be ordered unless the expression of the law is clear and the intent of the legislature manifest." *State v. Lilliock*, 70 Ohio St.2d 23, 26, 434 N.E.2d 723 (1982). "The law requires that we favor individual property rights when interpreting forfeiture statutes." *Ohio Dept. of Liquor Control v. Sons of Italy Lodge 0917,* 65 Ohio St.3d 532, 534, 605 N.E.2d 368 (1992); *Dodd v. Croskey*, 7th Dist. No. 12 HA 6, 2013-Ohio-4257, *discretionary appeal accepted*, 138 Ohio St.3d 1432, 2014-Ohio-889, 4 N.E.3d 1050.

**{¶81}** Given Ohio's proscription against forfeiture and accordingly the duty imposed upon courts to strictly construe statutes to favor individual property rights and avoid forfeiture, I disagree with how *Walker* and *Swartz* have construed the Ohio Supreme Court's holding in *State ex. rel. Jordan* with respect to vested rights. The majority has adopted *Walker's* holding that the 1989 ODMA was self-executing and given that character can be used to formalize ownership of the severed mineral rights even after the 2006 ODMA took effect, and affirmed *Walker's* analysis of what the

---

[3]Although the severed mineral rights holders argued the general rule that the version of a statute in effect should control resolution of a case, that the surface owners did not acquire their interest until after the 2006 ODMA took effect, and that their predecessors in interest failed to quiet title while the 1989 ODMA was in effect, the analysis in *Walke*r ignored these arguments, instead resolving the appeal based upon retroactivity and vesting principles, the latter concept having been misapplied.

General Assembly meant by the phrase 'deemed abandoned and vested' in R.C. 5301.56(B). Majority, *supra*, at ¶9, footnote 1; *Walker* at ¶41. In other words, the majority is overwriting the language of the statute by replacing the word 'deemed' with 'automatic'. Both *Walker* and *Swartz* held that by virtue of the holders' inaction, the surface owners were automatically, completely and definitely vested with the formerly severed mineral rights by operation of the self-executing 1989 ODMA before the 2006 ODMA took effect, reasoning that doing so would improperly divest the surface owners of their statutorily defined vested interest in the now reunited mineral rights. *Walker* at ¶41, *Swartz* at ¶27-29.

**{¶82}** However, this rationale ignores that by virtue of Ohio common law the severed mineral rights were definitely and completely vested in the Reussers when the 1989 ODMA took effect, and "cannot be taken away without [their] consent." *Harden v. Ohio Atty.* Gen.*,* 101 Ohio St.3d 137, 2004-Ohio-382, 802 N.E.2d 1112, ¶9. Because the 1989 ODMA did not require the holder's consent or notice, the Reussers' vested interest was taken arbitrarily and operated as a forfeiture, an especially harsh result considering the 1989 ODMA is being applied in a case filed after that version is no longer in effect, and the Reussers are precluded from availing themselves of the current version which provides for notice and the holder's consent. Logic dictates that if the 2006 ODMA changes cannot be retroactively applied to divest an owner of an interest deemed vested under the 1989 version, then the 1989 ODMA similarly cannot be used to retroactively divest an owner of an interest deemed vested under common law. The 2006 version is no more retroactive than the 1989 version; both refer to a preceding 20 year period, which, depending upon the facts of a particular case, can occur prior to the effective date of either version.

**{¶83}** Moreover, *Walker, Swartz* and the majority (implicitly by relying on *Walker*), have misconstrued the full meaning of the phrase 'deemed abandoned and vested.' Generally, 'interest' is defined as "2. A legal share in something; all or part of a legal or equitable claim to or right in property < right, title, and interest>. Collectively, the word includes any aggregation of rights, privileges, powers, and

immunities; distributively, it refers to any one right, privilege, power, or immunity." Black's Law Dictionary (9th Ed.2009).  Also instructive are the following definitions:

> *deem.* To treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have.
>
> *inchoate interest.*  A property interest that has not yet vested.
>
> *vested interest.*  An interest for which the right to its enjoyment, either present or future, is not subject to the happening of a condition precedent.

*Id.*

**{¶84}** Considering the entire statutory phrase from the ODMA, the term 'deem' modifies the remaining language.  To say that the severed mineral interest is 'deemed to be abandoned and vested' means that it has the qualities of a vested right that it does not yet have; in other words, that it is an inchoate interest.  The extent of the right the Eisenbarths held under both the 1989 and 2006 ODMA was the *potential* for abandonment and vesting, this right was not lost when the ODMA was amended.  Instead, the *procedure* surface owners had to follow to reunite the severed mineral rights with the surface fee was clarified.  This interpretation is borne out by the clarifying language adopted in the 2006 ODMA and the General Assembly's explanation of the reasons for the amendments, particularly the Legislative Services' characterization of the phrase as meaning when allowable vesting can occur; again, an inchoate rather than a fully vested right.

**{¶85}** Moreover, it must be recalled that the ODMA is part of the OMTA, which, in other sections, notably use more emphatic language like 'extinguished,' and 'null and void,' which is appropriately characterized as automatic in nature.  This stands in sharp contrast to the 'deemed' language used in the ODMA.  R.C. 5301.49, 5301.50, 5301.55.  To interpret the 1989 ODMA as self-executing would confound the purpose of the OMTA, as well as the ODMA: to engender reliance upon publicly recorded documents rather than private ones for transactions affecting title to real property, such as ownership of severed mineral rights.  Nothing in either version of the ODMA suggests that it should not be construed in pari materia with the OMTA.

Notice remains the watchword of the entire OMTA, an omission in the 1989 version that was corrected by the General Assembly in the 2006 version.

**{¶86}** This characterization is critical because the controlling definition results in the statute being construed as having either substantive or remedial effect. "Laws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws." *Kilbreath v. Rudy*, 16 Ohio St.2d 70, 242 N.E.2d 658, (1968), paragraph two of the syllabus. "Moreover, a statute is properly applied prospectively if it has been enacted after the cause of action but before the trial of the case." (Citations omitted.) *Estate of Johnson v. Randall Smith, Inc.,* 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶20.

**{¶87}** The interpretation of the 1989 ODMA in *Walker* and *Swartz* and adopted by the majority has resulted in a retroactive, substantive deprivation of the Reussers' common law vested interest in the severed mineral rights. The ODMA is remedial in nature; specifically, it was enacted to delineate the procedure to determine whether or not a severed mineral interest has been abandoned and if so, how to reunite it with the surface fee. By virtue of the 2006 ODMA, which we cannot ignore, the General Assembly clarified a major ambiguity in the 1989 ODMA; the 2006 ODMA expressly set forth the process for how to define the triggering event for calculation of 'the preceding twenty years' and 'successive filings.'

**{¶88}** As differentiated by the Ohio Supreme Court in a case concluding that a statutory amendment changed the method to calculate prejudgment interest rather than eliminated the right to seek it:

"The legislature has complete control over the remedies afforded to parties in the courts of Ohio, and it is a fundamental principle of law that an individual may not acquire a vested right in a remedy or any part of it, that is, there is no right in a particular remedy. * * * A party has no vested right in the forms of administering justice that precludes the Legislature from altering or modifying them and better adapting them to effect their end and objects. "

(Internal citations omitted.)  *Longbottom v. Mercy Hosp. Clermont*, 137 Ohio St.3d 103, 2013-Ohio-4068, 998 N.E.2d 419, ¶25.

{¶89} The function of the ODMA has always been remedial; to set forth *the judicial process to follow* when ownership of a severed mineral right is disputed. Resolution of the substantive question of ownership is an issue of *common law.* To interpret the 1989 ODMA as extinguishing a severed mineral rights holder's preexisting common law right to that interest would violate the Retroactivity Clause of the Ohio Constitution. *Id.* Consistent with *Longbottom*, the 2006 ODMA modified the remedy available to surface fee owners to reunite the severed mineral interest by clarifying the process to follow. *See Longbottom* at ¶26.  Both versions of the ODMA applied prospectively to any actions filed after their respective effective date. Because the Eisenbarths filed this case after the effective date of the 2006 ODMA, that version controls resolution of this appeal; had it been filed before, the 1989 version would have controlled.  As discussed below, sponsor testimony regarding the clarifications contained in the 2006 ODMA notes that those changes "*will neither alter the balance between surface owners and mineral rights owners*" further reinforcing the remedial character of R.C. 5301.56.

{¶90} Finally, conceding this argument was not raised by the parties, nonetheless the doctrine of laches is a fair consideration when determining which version of the ODMA to rely upon when a surface owner's claim to the severed mineral rights could have been, but was not, asserted before the effective date of the 2006 ODMA.  "'Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party.' *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 15 OBR 134, 472 N.E.2d 328, quoting *Smith v. Smith* (1957), 107 Ohio App. 440, 443, 8 O.O.2d 424, 146 N.E.2d 454." *Still v. Hayman*, 7th Dist. No. 02 JE 27, 153 Ohio App.3d 487, 2003-Ohio-4113, 794 N.E.2d 751, ¶8 (laches barred child support and reimbursement claims where paternity was hidden from father for over 15 years).

{¶91} Here, the Eisenbarths failed to avail themselves of the 1989 ODMA while it was still in effect.  An action to quiet title could have been filed on or

immediately after January 24, 1994 when the mineral rights arguably automatically reverted to them by operation of the statute. Instead, it wasn't until after the 2006 ODMA went into effect, that the Eisenbarths published a notice of abandonment *pursuant to the 2006 ODMA*—in response to which the Reussers timely filed a claim to preserve—in 2009, and then further delayed until September of 2012 to file a quiet title action, a lapse of 18 years. The prejudice to the Reussers is evident. Logic dictates that if the holder can be divested of their severed mineral rights as having been abandoned due to their inaction under the 1989 ODMA, then the 2006 ODMA can similarly be used to preclude reuniting the interest with the surface fee because of the surface owner's inaction, i.e., his failure to commence a quiet title action while the 1989 ODMA was still in effect.

**{¶92}** Inherent in the automatic, self-executing character ascribed to the 1989 ODMA by *Swartz* and the majority here is that the statute operates as a forfeiture. *Swartz* at ¶27 (1989 ODMA self-executing); Majority, *supra*, ¶9, footnote 1, ¶49; *Dodd* at ¶35 (concluding the provision in R.C. 5301.56(D)(1) which allows mineral rights holder to file a claim to preserve that interest even after having failed to do so within the 20 year look back period is premised upon the principle that forfeiture is abhorred in the law).

**{¶93}** Measured against Ohio's proscription against forfeiture, the 1989 ODMA as interpreted by *Walker, Swartz,* and the majority, has continued to validate a statute in derogation of the common law principle that a mineral right cannot be extinguished or abandoned by nonuse. Construed as an automatic self-executing statute, the 1989 ODMA operates as a forfeiture which is disfavored as a matter of Ohio law. Instead, the 1989 ODMA must be strictly construed to avoid forfeiture because to do otherwise would be in derogation of private property rights. With respect to the caveat that forfeiture can only be ordered where the legislative intent to do so is manifestly clear, we have the inverse here. By virtue of the 2006 ODMA, the General Assembly has made manifest that it did not intend for the 1989 ODMA to be self-executing. Rather, the holder was to have notice and an opportunity to preserve their severed mineral rights even after they have lapsed for failure to file a claim to

preserve or the occurrence of a savings event within the previous 20 year look back period.

{¶94} R.C. 5301.56 presently is not, nor was it ever intended to be, self-executing. When comparing the 1989 and 2006 versions of R.C. 5301.56, the latter clarifies that the purpose of the phrase 'deemed abandoned and vested' as intended by the General Assembly, was to set parameters against which to assess whether mineral rights have been abandoned and create a process through which *allowable vesting could occur* in the surface owner. Had the 1989 ODMA provided for automatic vesting, the General Assembly could have used more definitive terms such as 'extinguished' or 'null and void' as found in other sections of the OMTA, rather than the more equivocal term 'deemed.'

{¶95} Rather, only after the holder has had notice that the owner claims the mineral rights have been abandoned, and has had one last opportunity to either establish that in fact the mineral rights have not been abandoned or else to revive them, *only then* may the surface owner cause such abandonment to be memorialized in the county recorder's office; *only then* have the mineral rights vested in the surface owner. R.C. 5301.56(H).

{¶96} The intended purpose of the 1989 ODMA was to create and maintain a clear, current and reliable record chain of title with respect to ownership of severed mineral rights. The ODMA was not enacted to force holders to 'use their mineral rights or lose them.' The holders' presumed failure to develop those mineral rights does not support this interpretation of the 1989 ODMA because it is based upon an arbitrary assumption that the severed mineral rights holders have deliberately abandoned their vested common law property rights. Instead, the intended purpose of the 1989 ODMA was to maintain a current public record of the severed interests being held until such time—as this litigation bears out—that technology advances make it economically feasible to develop those mineral rights. Therefore, it is reasonable to conclude that the changes made in the 2006 ODMA were remedial, i.e., they clarified procedure to judicially determine whether or not the holders wish to preserve or abandon their interest.

**{¶97}** For all these reasons, the 1989 ODMA created an inchoate, not a vested right.  To construe it otherwise creates a forfeiture which is rejected as a matter of Ohio law.  R.C. 5301.56 is a remedial statute that sets forth the procedure to determine ownership of a severed mineral interest.

### Indiana Lapsed Mineral Act and *Texaco v.Short*

**{¶98}** The majority suggests at footnote 1 that the Reussers have conceded that the trial court could use the 1989 ODMA and that it was a self-executing statute akin to Indiana's Mineral Lapse Act as so characterized by the U.S. Supreme Court decision in *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982).  Thus, it appears the majority has implicitly adopted and applied the *Texaco* rationale, consistent with the *Swartz* panel's express reliance on *Texaco*, which referenced and relied upon *Walker* in doing so.  Majority, *supra* at ¶9, footnote 1; *Swartz*, ¶27-28.  I disagree.  Again, as discussed above, regardless of any concession made by a party with respect to controlling law, neither *Texaco* nor the Indiana statute has persuasive or precedential value.

**{¶99}** First turning to two elemental points, the constitutionality of Indiana's statute was at issue in *Texaco,* whereas the constitutionality of the 1989 ODMA was not at issue in this appeal, *Walker* or *Swartz*, further undermining the persuasive value of *Texaco*.  On this basis alone *Texaco* is distinguishable.  Second, it appears that Indiana's Act remains unchanged with respect to its notice provisions, and presumably because the U.S. Supreme Court in *Texaco* held the Act did not violate federal constitutional principles, affirming the Indiana Supreme Court's decision in *Short v. Texaco, Inc.,* 273 Ind. 518, 406 N.E.2d 626 (1980) that a self-executing statutory abandonment is constitutionally enforceable.

**{¶100}** Substantively, the language of the Indiana statute is unequivocal, and lends itself to an interpretation that vesting is automatic.  Ind.Code 32-23-10-2 provides:  "An interest in coal, oil and gas, and other minerals, if unused for a period of twenty (20) years, *is extinguished and the ownership reverts* to the owner of the interest out of which the interest in coal, oil and gas, and other minerals was carved.  However, if a statement of claim is filed in accordance with this chapter, the reversion

does not occur." (Emphasis added.) *Id.* This language is consistent with other portions of the OMTA which, as explained above, use terms such as 'null and void' or 'extinguished,' and arguably warrant an automatic characterization, unlike the qualified phrase in R.C. 5301.56 'deemed abandoned and vested,' which should not be construed as having a similar automatic effect.

**{¶101}** In contrast to the Indiana statute, the Ohio General Assembly amended R.C. 5301.56 to clarify when a mineral interest became abandoned and delineate the exact process to reunite the severed mineral rights with the surface owner. Central to those modifications is that in all instances *before any allowable vesting can occur*, the surface owner must notify the holder of the severed mineral rights of the owner's intention to declare the rights abandoned, even in the absence of a saving event within the now clearly defined look-back period, in order to afford the holder one final opportunity to preserve their mineral rights from abandonment. R.C. 5301.56(E)(2) and (G). Even where the holder failed to engage in one of the statutorily defined actions to preserve their mineral rights, including merely filing an affidavit preserving those rights, the Ohio General Assembly gave the holder 60 days to, in essence, revive their mineral interest. This is the antithesis of a self-executing statute. Moreover, that the 1989 ODMA was not, nor intended to be, self-executing is evident from the testimony of the 2006 ODMA sponsor and the Legislative Services final bill analysis, discussed in more detail below. This vigorous statutory protection stands in stark contrast with Indiana's statute.

**{¶102}** Ohio's General Assembly seized the opportunity to clarify its intent and correct R.C. 5301.56, thereby statutorily rejecting *Texaco.* The majority here and in *Walker* and *Swartz,* measuring R.C. 5301.56 against federal constitutional standards not at issue here, have created a forfeiture out of what were heretofore private property rights protected at common law from extinguishment by abandonment or nonuse; under the common law, affirmative action was required by the mineral rights holder before they could be divested of their interest. This is in direct contravention of the General Assembly's express decision to give Ohio citizens more statutory protections than the Indiana Legislature afforded its citizens.

{¶103} Thus, *Texaco* has no bearing on which version of R.C. 5301.56 controls disputes over ownership of mineral rights brought after the Act's June 30, 2006 effective date.

**2006 ODMA Governs Resolution of Severed Mineral Rights Dispute**

{¶104} Turning to the merits, for cases like this one, where the litigation to resolve disputes between the surface fee owner and the holder over severed mineral rights was filed after the 2006 ODMA took effect, the 2006 version controls; the 1989 version has no force or effect. This conclusion is consistent with reading the OMTA and the ODMA in pari materia, and more importantly, with the General Assembly's express intent in enacting the 2006 ODMA and the statute's clear unambiguous language.

{¶105} My rationale for this conclusion is multi-faceted, but must begin with the fact that the General Assembly has expressly stated the purpose of the OMTA and the extent of judicial interpretation: "Sections 5301.47 to 5301.56, inclusive, of the Revised Code, shall be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title[.]" R.C. 5301.55. *See also Collins v. Moran,* 7th Dist. No. 02 CA 218, 2004-Ohio-1381, ¶20. And as stated in the Legislative Service Analysis of the 2006 ODMA, a clear public record of ownership of mineral interests will facilitate economic oil and gas production. Thus, the ODMA, as a portion of the greater statutory scheme of the OMTA, should be construed to "support reliance on public documents rather than private communications for title transfers. *Dahlgren* at *6.

{¶106} To construe the 1989 version as automatically self-executing, as well as controlling despite being replaced by the 2006 version, thwarts the General Assembly's express intention to require recordation of all interests to facilitate a searchable chain of title for real property in general and for mineral rights specifically. In addition it flies in the face of the General Assembly's stated purpose of encouraging economic mineral production. The 2006 ODMA corrected omissions and clarified ambiguities in the 1989 version to bring it in line with the rest of the OMTA to facilitate the creation and maintenance of a current and accurate chain of

title of mineral rights.  Because of the 1989 ODMA's lack of a clearly defined process to place and maintain severed mineral rights within a chain of title, mineral rights in Ohio could not be easily accounted for or gathered for mineral production, an especially acute problem when as now, it has become economically viable to develop those interests.  Finally, as discussed above, had the General Assembly meant to equate 'deemed abandoned and vested' with 'automatic vesting' it could have used more unequivocal language found in other sections of the OMTA.  By construing the 1989 ODMA as automatically vesting the mineral rights in the surface fee owner, and moreover concluding that R.C. 5301.56 left it to the discretion of the surface owner to record a statement of reunification of the interests, the majority further ignores the requirements of the OMTA.

{¶107} Interpreting the 1989 ODMA as providing the Eisenbarths with an inchoate right rather than an automatic vested right is consistent with language in other sections of the OMTA.  As a part of the general statutory scheme addressing all land title issues, the ODMA is a more specific statute governing title transactions related only to coal and other mineral rights.  R.C. 1.51 dictates that a special provision should be construed with a more general provision, if possible, to give effect to both.  As part of the general OMTA, the ODMA can be read as the surface owner having an inchoate right and still give effect to its specific provisions within the global purposes of the OMTA.  An example of the ODMA provisions trumping that of the OMTA, consistent with the specific versus general statutory canon of construction, would be that the ODMA 20 year look-back period controls over the OMTA 40 year look-back provision in the chain of title.

{¶108} Second, a review of sponsor testimony and the Legislative Services analysis demonstrates that the Ohio General Assembly was aware that the ambiguity inherent in the 1989 ODMA emasculated the statute to such an extent that it was not being used, thus defeating the policy goals of fostering the economic development of mineral interests as well as the stated purpose of the OMTA that all interests affecting real property be recorded in the chain of title:

House Bill 288 seeks to update Ohio's mineral rights law, House Bill 288 contains two proposed amendments to Ohio's existing statutory scheme affecting energy production. *The bill is designed, first, to address technical problems* with Ohio's current Dormant Mineral Statute and, second, to resolve procedural problems with The Ohio Oil and Gas Commission. *The General Assembly can take these two steps to help increase the availability of domestic energy supplies* without adversely affecting the environment or state tax collections.

Turning first to the Dormant Mineral Statute, Ohio has had an active energy production industry since the mid 1800's. During this period, landowners in mineral producing areas have frequently severed the mineral rights in their land from the surface rights. Through the decades, ownership of the severed minerals has been transferred and factionalized through estates and business transfers. Today, those old severed mineral rights may be the key to new production sites, as advances in current technology and the high cost of energy make reworking old oil and gas fields possible.

The problem is that it may be difficult - if not impossible - to find the owners or in some cases the multiple partial interest owners of such old severed mineral rights. Twenty years ago, Ohio joined the majority of oil and gas producing states by passing a Dormant Mineral Statute that permitted the surface owner to reunite severed mineral rights with the surface estate if the mineral rights had been abandoned. Unfortunately, *Ohio's Dormant Mineral Statute has seldom been used, in large measure because the statute did not clearly define when a mineral interest became abandoned and exactly how the process to reunite the mineral ownership with the surface ownership was to be accomplished.*

House Bill 288 *removes the ambiguity of the existing statute with a clear definition of when a mineral right is deemed abandoned*. The

mineral right will be deemed abandoned if there is both (1) no active use of the mineral rights and (2) a failure by the mineral rights owner to file to preserve the inactive mineral rights for future use for at least 20 years from the time a surface owner petitions to reunite the surface with the inactive mineral interest.

> *The first part of House Bill 288 is designed to fix perceived problems with the existing maturity provisions. The bill will [not] alter the balance between surface owners and mineral rights owners*[.].

(Emphasis added.) H.B. 288 Rep. Mark Wagoner, Sponsor testimony before the Ohio House Public Utilities Committee.

**{¶109}** This testimony contradicts the observation in *Swartz* that there was a clear court action which already existed to formalize statutory vesting. *Id.* at ¶22. Further, that the 1989 ODMA did not provide for an automatic vesting of the severed mineral interest in the surface fee holder but rather the potential for vesting—an inchoate right—can be found in the Ohio Legislative Service Commission final bill analysis:

ACT SUMMARY

• Defines "mineral" and "mineral interest" for purposes of the mineral interests law, which specifies circumstances under which a mineral interest cannot be *deemed* abandoned, thereby precluding such an interest being vested in the owner of the surface land.

• Requires that, *for any allowable vesting to occur*, the landowner must notify the holder of the mineral interest and file an affidavit of abandonment as specified in the act.

* * *

• Defines the length of any such 20-year period as ending on the service or publication date of requisite surface landowner notification to the holder of a mineral interest that the landowner is acting to declare the interest abandoned.

* * *

- Requires the abandonment to be memorialized on a specified county record and provides that the mineral interest then becomes vested in the landowner, and the record of the mineral interest ceases to be public notice of the mineral interest.

\* \* \*

CONTENT AND OPERATION

*Vesting of abandoned mineral interests*

(R.C. 5301.56)

Ongoing law specifies that any mineral interest held by any person *can be deemed abandoned* and vested in the owner of the surface of the lands subject to that mineral interest except under certain circumstances. The act revises some of those circumstances and adds new, specified notification and affidavit requirements *for allowable vesting to occur.*

\* \* \*

*Circumstances that prohibit vesting*

Six additional circumstances that prohibit vesting under continuing law are contingent on them having happened within the *preceding* [emphasis in original] 20 years. *The act specifies that this 20-year period is the 20 years immediately preceding the date on which the new holder notification is served or published as required by the act* (see below) (R.C. 5301.56(B)(3)).

OH Bill Analysis, 2006 H.B. 288, 2006 (emphasis added).

**{¶110}** In light of the foregoing, any arguable ambiguity regarding 'deemed abandoned and vested' and whether it created an inchoate or automatic vested right was resolved by the General Assembly.  The General Assembly stated that the 1989 version's language was ambiguous because "*the statute did not clearly define when a mineral interest became abandoned and exactly how the process to reunite the mineral ownership with the surface ownership was to be accomplished."  Contra Swartz.*  Thus, the General Assembly has expressed the remedial nature of R.C.

5301.56. Accordingly, it is error to apply the 1989 ODMA to any litigation filed after the effective date of the 2006 ODMA.

**{¶111}** Insofar as the sponsor testimony regarding the 2006 ODMA indicates that it "will [not] alter the balance between surface owners and mineral rights owners," the statute is clearly not substantive in nature, rather it is remedial. As discussed above but bears repeating here, "[l]aws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws." *Kilbreath, supra*, 16 Ohio St.2d 70 at paragraph two of the syllabus. Accord *Estate of Johnson,* 135 Ohio St.3d 440 at ¶20.

**{¶112}** Moreover, no part of a statute "should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *Boley v. Goodyear Tire & Rubber Co.,* 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E. 448, ¶10. Statutes "'may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act.'" *Weaver v. Edwin Shaw Hosp.,*104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶13, quoting *Wachendorf v. Shaver,* 149 Ohio St. 231, 78 N.E.2d 370 (1948), paragraph five of the syllabus. "In determining the intention of the General Assembly as to the meaning and operation of statutes, a court, if possible, should avoid absurd and grotesque results." *State v. Nickles*, 159 Ohio St. 353, 112 N.E.2d 531 (1953), paragraph one of the syllabus.

**{¶113}** Had the General Assembly intended 'deemed abandoned and vested' in the 1989 ODMA to mean automatic vesting, and meant that the 2006 ODMA did not apply to any severed mineral interest which had reunited with the surface fee by operation of law, it could have so stated. In other words, the General Assembly could have stated that the 2006 ODMA applies only to severed mineral rights which had not reverted to the surface fee owner by operation of the 1989 ODMA, or that it applied only to mineral rights which were severed after the effective date of the 2006 version. Instead, when crafting the 2006 ODMA language the General Assembly enacted the

notice provisions and clarified the method for calculating the 20 year look-back period by defining the triggering event, clearing up the ambiguity in the operation of a remedial statute. *See Longbottom.*

{¶114} To construe the 1989 version as a self-executing statute providing for automatic vesting defeats the purpose of the 2006 ODMA. Why would the General Assembly create a mechanism for the mineral rights holder to revive that interest if it had already vested in the surface fee? As this court held in *Dodd,* "R.C. 5301.56(H)(1)(a) allows for a mineral interest holder to take a present action by filing a claim to preserve the mineral interest after notice, even though the claim was not filed within the 20 years immediately preceding notice, is supported by the general rule that the law abhors a forfeiture." *Id.* at ¶35. This interpretation of express statutory language reinforces that the surface fee owner holds an inchoate right. To construe the 1989 ODMA as automatically self-executing renders the 2006 version meaningless and inoperative. *See Boley.* We do not need to determine the General Assembly's intention with respect to the meaning and future operation of the 1989 ODMA after the effective date of the 2006 ODMA because the newer version of the statute has told us.

{¶115} For *Walker, Swartz* and the majority to so construe the 1989 version and further to give it force and effect after the effective date of the 2006 version creates an absurd result, nullifying the changes the General Assembly made to remedy an ambiguous statute. *See Nickles; Sponsor testimony, Legislative Service Report, supra.* Carrying the majority's analysis to its logical conclusion: 1) all severed mineral interests throughout the state of Ohio that did not have a savings event take place within the 20 year period preceding the 1989 ODMA effective date or within the 3 year grace period automatically vested in the fee surface owner, never to be revived by operation of R.C. 5301.56(H)(1)(a); or, 2) the 2006 version could only apply to mineral rights severed after the effective date.

{¶116} Finally, I agree with conclusions made by the trial court in *Dahlgren* in support of its determination that the 1989 ODMA created an inchoate right, and because R.C. 5301.56 is a remedial statute 2006 ODMA controls litigation filed after

its effective date, regardless of when the mineral rights were severed or the surface fee holder acquired their interest.

{¶117} First, nothing in either version of the ODMA suggests that the general provisions of the OMTA which complement the more specific mineral rights distinctions in the ODMA do not apply when considering disputes over mineral rights. *Dahlgren* at *13. Consistent with the express purpose of facilitating reliance on a recorded chain of title, the General Assembly brought the ODMA in conformity with this principle by imposing upon both the surface owner and the severed mineral rights holder the recordation requirements in the 2006 ODMA. R.C. 5301.56(G) and (H). Second, as discussed above, the ODMA uses "considerably less conclusive language" than the OMTA which "strongly suggest[s] that it provides standards but does not resolve the issue." *Dahlgren* at *15. Finally, the majority's interpretation creates an anomaly when interpreting the ODMA within the larger statutory scheme of the OMTA, by concluding that severed mineral rights can be automatically vested outside of the recorded chain of title where the holder has a recorded marketable title record. *Dahlgren* at *15. Said differently, interpreting the 1989 ODMA as a self-executing statute automatically vesting a severed mineral interest in real property outside the recorded chain of title carves out an exception to the overall statutory scheme that defeats, rather than promotes, the legislative purpose of enhancing reliance on public records with respect to ownership of *any* interest affecting real property in general, and encouraging economic use of mineral rights specifically.

{¶118} For all of these reasons, where, as here, the mineral rights were severed and the surface owner acquired their interest before or while the 1989 ODMA was in effect, but did not take legal action to declare the holder's interest abandoned and seek reunification of the mineral rights with their surface interest until after the effective date of the 2006 ODMA, the latter controls resolution of disputes over ownership of the severed mineral rights. As the Eisenbarths were holders of one-half of the mineral rights and the sole holders of the executive rights over the entire mineral interest, the oil and gas lease they executed in 2008 operated as a savings event pursuant to the 2006 ODMA, thereby preserving the Reussers' interest

in the severed mineral rights through 2018. Thus, the Reussers' interest is preserved, and they are entitled to the bonus and any revenue generated by the executed lease.

**Alternative 1989 ODMA Analysis**

{¶119} Moreover, I disagree with the manner in which the majority has interpreted the 1989 version of the ODMA. The 1989 ODMA provides: "A mineral interest may be preserved indefinitely from being deemed abandoned under division (B)(1) of this section by the occurrence of any of the circumstances described in division (B)(1)(C) of this section, including, but not limited to, successive filings of claims to preserve mineral interests under division (C) of this section." R.C. 5302.56 (D)(1), 1988 S 223, eff. 3-22-89.

{¶120} Because R.C. 5302.56(D)(1) refers to successive filings, the 1989 ODMA contemplated that the holder of severed mineral rights was required to renew that interest of record every 20 years. Thus, the Reussers were required to make some kind of successive filing before the initial 20 year period expired on January 23, 1994. Because they failed to do so, by operation of the 1989 ODMA, the severed mineral rights reverted back to the Eisenbarths on January 24, 1994.

{¶121} Applying the majority's rationale that the 1989 ODMA is self-executing, the 2008 oil and gas lease cannot constitute a savings event for the Reussers because they were no longer holders of mineral rights that could be preserved as of that date. Those mineral rights automatically vested and reverted to the Eisenbarths on January 24, 1994, 14 years earlier. The 2008 lease was recorded 34 years after the last savings event, well beyond the 20 year look-back period provided for in the statute. Only the 2006 ODMA provides a 60 day window for a mineral rights holder to preserve their interest where, as here, the holder has been notified that there has been a gap in excess of 20 years from a preceding savings event.

{¶122} I also disagree with the parties' and the majority's characterization of the 20 year look-back period as either rolling or fixed. Trying to glean the General Assembly's meaning of the ambiguous phrase 'preceding 20 years' in order to determine the triggering event for calculating the initial 20 year period requires a

reading of that language within the context of not only R.C. 5301.56, but the OMTA as well. As noted above, a statute must be construed so that it is not meaningless or inoperative; instead each phrase must be accorded meaning in order to avoid absurd results. *Boley, Weaver, Nickles, supra.* Again, setting aside that we now know what the General Assembly intended, a more reasoned interpretation is as noted by the majority's reference to the trial court's finding in *Bender v. Morgan*, Columbiana C.P No. 2012-CV-378. In *Bender,* the trial court looked back 20 years from the effective date of the 1989 ODMA and found a savings event, a lease executed in 1988, which in turn triggered a successive 20 year period preserving the holder's interest. Majority, *supra* at ¶44. Such a holding would be consistent with reading R.C. 5301.56 in its entirety, rather than interpreting the meaning of 'successive filings' found in subpart (D)(1) in a vacuum, contrary to canons of statutory construction.

{¶123} The Eisenbarths' argument to construe the 1989 ODMA as contemplating a rolling date, which would be subject to an arbitrary selection of some random date to put a savings event outside the 20 year look-back period is so violative of due process it does not warrant further discussion.

{¶124} Regarding a fixed period, the majority's analysis at paragraphs 45 through 50 simultaneously reinforces the ambiguity of the 1989 ODMA as a whole, and ignores the statutory language referencing successive filings. The provision in R.C. 5301.56(D)(1) delineating the process for preserving severed mineral rights for successive terms signals the General Assembly's intention that in order to preserve that interest, every 20 years a savings event must occur or the holder must file a claim to preserve, in order to retain their interest for another 20 years. Any speculation to the contrary regarding the General Assembly's intent is put to rest by virtue of the above discussion with respect to the enactment of the 2006 ODMA.

{¶125} Ambiguous statutes must be construed to give every word meaning if possible. Since the majority has concluded that the 1989 ODMA is self-executing, in the absence of a savings event or the filing of a claim to preserve within the initial 20 year period to preserve the interest for a second, prospective 20 year period, the severed mineral rights are automatically vested in the surface owner. Here, the initial

20 year period in this case was triggered by the oil and gas lease executed on January 23, 1974. Because there was not a successive savings event before that initial 20 year period expired to trigger a second 20 year period, the Reussers' mineral rights automatically vested in the Eisenbarths on January 24, 1994. Applying the majority's decision that the 1989 ODMA is self-executing, the 2008 oil and gas lease could not preserve the Reussers' mineral rights because they no longer owned them; fourteen years prior ownership automatically transferred to the Eisenbarths. In sum, the majority's substantive 1989 ODMA analysis is flawed.

## Conclusion

**{¶126}** I am mindful of the principle of stare decisis, and it is the law of this district—unless and until the Ohio Supreme Court decides the issue—that the 1989 ODMA controls resolution of disputes over severed mineral rights arising before the effective date of the 2006 ODMA, even where litigation to assert those rights was filed after the 2006 ODMA effective date. However, as this is my first opportunity to address what was an issue of first impression in this district and Ohio, I must disagree. Given the expressed intent of the Ohio General Assembly in enacting the 2006 version—specifically, to correct technical problems which resulted in the ambiguous 1989 version rarely being used—the 2006 version of R.C. 5301.56 must control litigation brought after its effective date. However, applying the 2006 ODMA, I would reach the same conclusion as the majority and would affirm the trial court.

**{¶127}** Moreover, the majority's substantive 1989 ODMA analysis is flawed. Applying the majority's determination that the 1989 ODMA controls resolution of this case, the 2008 oil and gas lease does not constitute a savings event for the Reussers because it was recorded over 30 years after the preceding savings event. Given the majority's rationale of the self-executing nature of the 1989 ODMA, the Reussers' mineral rights were automatically abandoned and vested in the Eisenbarths as of January 24, 1994, because the Reussers failed to file a successive claim to continue to preserve their mineral rights pursuant to division (D)(1) of the 1989 ODMA on or before January 23, 1994.